Hamlin et al. vs. the Board of Liquidators.

No. 6873.

H. W. HAMLIN ET AL. VS. THE BOARD OF LIQUIDATORS. ISIDORE NEWMAN, INTERVENOR.

In the absence of proof to the contrary, it must be assumed that in the issue, and negotiation of certain State bonds nearly twenty-five years ago, the Governor and Treasurer, who were charged with their issue and negotiation, fulfilled the trust confided to them in accordance with the terms of the law which authorized the issue of the bonds.

Where bonds of the State, payable to the order of a certain payee, and indorsed in blank by the payee, are offered and received in evidence without objection, the indorsements will be deemed sufficiently proved to establish in the holder, a legal title to the bonds.

Under the plea of general denial, in a suit brought to enforce the funding of certain State bonds, evidence is not admissible to prove an adverse title to the one declared on by the holder of the bonds.

In suits between holders of bonds and the Board of Liquidation, (under the funding acts of 1874 and 1875) the only question that can be put at issue is the validity of the bonds, as obligations of the State. The issue of the *ownership* of the bonds can not be raised, save by a rival claimant, intervening and setting up an adverse title.

The mere fact that a certain bond of the State belongs to one of the issues declared by the act of 1875 to be questioned and doubtful, will not authorize the holder of that bond to intervene in a suit brought against the Board of Liquidators by the holder of bonds belonging to *another* of the questioned and doubtful issues.

Bonds of the State that appear to have been issued according to law, and to have had a lawful consideration, are valid obligations of the State entitled to be funded.

The costs of a suit brought by the holder of bonds to compel the Board of Liquidators to fund his bonds, must be paid out of the treasury of the State, if the Board is cast in the suit.

APPEAL from the Fifth District Court, parish of Orleans. *Rogers, J.*

*Kennard, Howe & Prentiss,* for plaintiff and appellee.

*H. N. Ogden,* Attorney General, for defendants.

The opinion of the court was delivered by

MARR, J. Plaintiffs, assignees of the Exchange Bank of Canandaigua, allege that they are the lawful holders and owners of five bonds, Nos. 13, 14, 15, 16, 20, of the State of Louisiana, issued to the Baton Rouge, Grosse Tête, and Opelousas Railroad Company in accordance with Acts Nos. 179, 231, 271, of 1853, in exchange for stock of said company, indorsed by said company, and purchased by their assignees in open market, in the city of New York, in good faith, for value, without notice.

That they desire to fund said bonds, under the provisions of Act No. 3, of 1874; but the Board of Liquidation refuse to fund them, alleging they are forbidden to do so by Act No. 11, of 1875, extra session.

That said bonds were issued in strict conformity to law, and not in

violation of the constitution of this State, or of the United States, and for a valid consideration; and that they are entitled to be funded.

They pray that it be decreed that these bonds were issued in strict .conformity to law, and not in violation of the constitution of the United States, or of this State, and for a valid consideration; and that they ought to be funded.

Isidore Newman intervened, alleging that he is lawful holder and owner for value and in good faith, of one bond of the State of Louisiana, issued under the act for the relief of the State treasury, approved April 30, 1853, to the order of the State Treasurer, and by him indorsed, being No. 605 of said issue.

The other allegations and the prayer correspond with those in the petition of plaintiffs.

The Attorney General appeared for the Board of Liquidation, and answered the demands of plaintiffs and intervenor by general denial. He afterward filed amended answers, alleging that the bonds in question are not valid obligations in the hands of relators; that the Act No. 81, of 1872, so far as it authorized the re-issue of the said bonds, is void; and that the State has received no valid consideration for them.

The judgment of the district court was in favor of plaintiffs and intervenor, as prayed for; and we are called upon to review that judgment.

By the constitution of 1845, article 113, the Legislature was forbidden to "pledge the faith of the State for the payment of any bonds, bills, or other contracts or obligations, for the benefit or use of any person or persons, corporations, or body politic whatever."

Works of internal improvement, considered to be of great importance to the public interest, were projected, for the prosecution of which the aid of the State was deemed essential; and one of the chief objects of calling the convention of 1852, was to remove the restrictions on the legislative power to contract, imposed by the constitution of 1845. We are indebted to this convention for the constitution of 1852, article 109 of which gave power to the legislature "to grant aid to companies or associations of individuals, formed for the exclusive purpose of making works of internal improvement wholly or partially within the State, to the extent of one fifth of the capital of such companies, by subscription of stock, or loan of money, or public bonds."

Article 114, of the constitution of 1845, provided that "the aggregate amount of debts hereafter contracted by the Legislature shall never exceed one hundred thousand dollars, except in case of war, to repel invasions or suppress insurrections, unless for some single object or work, to be distinctly specified therein."

Article 110, of the constitution of 1852, fixed the limit of liabilities

that might be incurred at eight millions of dollars; and article 111 required the Legislature, in the law creating a debt exceeding one hundred thousand dollars, "to provide adequate ways and means for the payment of the current interest and of the principal, when the same shall become due."

The Legislature of 1853, the first that met under the constitution of 1852, exercised freely the power conferred by that instrument. Act No. 179, the sole object of which was "to grant the aid of the State to the Grosse Tête and Baton Rouge Plank-road Company," made it the duty of the State Treasurer, within ten days after the passage of the act, to subscribe, on behalf of the State, for two thousand shares, of twenty-five dollars each, of the stock of the company, that being one fifth of the whole number of shares, representing one fifth of the entire capital.

The object of Act No. 231, as declared by the title, was "to provide for the manner of giving the aid of the State to railroad and plank-road companies." It authorized the issue of bonds of the State, each · for $1000, having forty years to run, bearing six per cent interest, to the order of the company, to be delivered to the company, at par, in payment for stock taken and subscribed by the State, for an amount equal to one fourth of the amount actually received by the company from its other stockholders. Provision was made for the payment of the current interest and principal of these bonds; and by section two "said bonds may be transferred by the indorsement of the president and secretary of the company."

The Grosse Tête and Baton Rouge Plank-road Company was organized by notarial act, under the general corporation law of the State. By Act No. 271 of 1853 the charter was amended, and the company was incorporated under the name of the "Baton Rouge, Grosse Tête, and Opelousas Plank-road Company;" and, by section four, "with the vote of two thirds of the stock of said company, said road, or any part thereof, may, at any time, be converted into a railroad or common toll road."

The testimony of Andrew S. Herron, formerly Secretary of State, proves that the five bonds held by plaintiffs, which are for $1000 each, dated April 7, 1855, were issued to the "Baton Rouge, Grosse Tête, and Opelousas Railroad Company, in 1855 and 1856, in exchange for stock of the company subscribed by the State under and in conformity with Acts Nos. 179, 231, 271, of 1853. The railroad was at first a plank-road; but at the time of the issue of these bonds it had been converted to a railroad under its said name, under the provisions of the law."

The Auditor of Public Accounts certifies that these five bonds, "in favor of the Baton Rouge, Grosse Tête, and Opelousas Railroad Company, were issued to said company in accordance with Act No. 231 of 1853."

Act No. 277 of 1853, entitled "An Act to provide the means necessary

for the relief of the treasury of the State," authorized the Governor to issue bonds, in sums of $500 each, having forty years to run, for the total amount of $750,000. It was the duty of the Governor, forthwith, by publication for sixty days, to invite proposals for the purchase of these bonds, and to accept the best price offered, not less than par. This Act provided for the payment of the current interest and principal of these bonds.

These several acts seem to have been very carefully drawn, and to have been in strict conformity to the power conferred by the constitution of 1852, articles 109, 110, 111.

The five bonds held by plaintiffs, and the bond held by intervenor, and the indorsements on them, appear by the note of evidence, to have been offered and received without objection. Those held by plaintiffs purport to have been indorsed in blank by the president and secretary of the company to the order of which they were made payable; and the bond held by intervenor purports to have been indorsed in blank by the State Treasurer, to whose order it was made payable.

The mere legal title of these bonds is in the bearer, any holder in virtue of the indorsements in blank by the payees, which, having been offered and received in evidence without objection, were sufficiently proven, and must have their legitimate effect, that is, to show title in the holders for the purposes of the suit.

The Attorney General offered certificates of the Treasurer to prove that these bonds belonged to the " free-school fund," and that they were sold as assets of that fund under act eighty-one of 1872. As they were not issued, and did not originally belong to that fund, the position thus taken by the Attorney General virtually admits the genuineness of the indorsements, by which alone they purport to have passed from the ownership and dominion of the original payees; but, independently of this, the indorsements are sufficiently proven, as already stated.

The five bonds held by plaintiffs are each for the amount and in the form prescribed by the act 231 of 1853. They were transferred by the indorsement of the president and secretary of the company to which they were issued, as authorized by that act; and they were issued and delivered to the company in payment for stock taken and subscribed by the State, in accordance with acts 179, 231, 271, of 1853, in conformity to articles 109, 110, 111, of the constitution of 1852.

The bond held by intervenor is one of the series each for $500, which the Legislature, by act No. 277, of 1853, authorized the Governor to issue in aid of the treasury of the State. It was proper to make these bonds payable to the order of the Treasurer; and the bond in question was legally transferred and made payable to bearer by the official indorsement in blank of the payee.

In the absence of proof, or even suggestion to the contrary, it must be assumed that what the Governor and the State Treasurer did, nearly a quarter of a century since, in virtue and in execution of a power and trust conferred by special law, was done in accordance with the terms and requirements of that law; and that the bond held by intervenor, one of those issued for the relief of the State treasury, was negotiated to the highest bidder at not less than par, after proposals had been invited, as required by the act. Indeed, the attempt of the Attorney General to prove that this and the bonds held by plaintiffs belonged to the free-school fund necessarily pre-supposed that they were valid obligations of the State, and that they passed lawfully as such to that fund, in virtue of transfers sufficient to divest the title of the original payees.

It will be observed that neither the original nor the amended answers set up any title or claim to the bonds in question. When the Attorney General offered proof that they had belonged to the free-school fund, and that they were sold under act eighty-one of 1872 at certain rates per cent, counsel for plaintiffs and intervenor objected on the grounds:

First—That the answer is a general denial; and it is not competent for the Attorney General to make the proof sought to be made.

Second—That the bonds on their face do not indicate to any third person or *bona fide* holder their value, or any adverse ownership of any kind.

The amended answers were filed nine days after this testimony had been offered and admitted; but if they had been filed at that time they contain nothing which would have made it admissible, if it was not admissible under the general denial. If the testimony tended to show that these bonds had belonged to the free-school fund, it tended equally to show that the State had received a valuable consideration for them twice, once when they were issued to the original payees and holders; and again when they were put upon the market in 1872.

The judge of the district court considered the objections as going to the effect not to the admissibility of the testimony; and he overruled them on that ground. We think the testimony was not admissible to prove an adverse title, because no such title was set up in the answers. It was not alleged that these bonds had belonged to the free-school fund, nor that they were re-issued by authority of act eighty-one of 1872.

The difference between these bonds and those held by Durant is manifest. These bonds on their face are negotiable, and they purport to have been negotiated by the original payees. The bonds held by Durant were issued under act 182 of 1857, and were payable to the free-school fund. On their face they were not negotiable; and they were not originally designed to be negotiated. They were given as evidence of

the amount of money due by the State to the free-school fund; and they could not have been lawfully negotiated or put upon the market. 29 An. 77.

By act No. 3 of 1874, provision was made for funding the outstanding valid obligations of the State. By act No. 11 of 1875, the Board of Liquidation created under the Funding Act of 1874 was forbidden to fund certain bonds and warrants, "the legality of which has been or may be questioned, until such bonds or warrants shall first, by final decree of the Supreme Court of Louisiana, have been declared legal and valid obligations against the State of Louisiana, and that the same were issued in strict conformity to law, and not in violation of the constitution of this State, or of the United States, and for a valid consideration."

The second section of this act specifies certain bonds, among others, those issued to the Baton Rouge, Grosse Tête, and Opelousas Railroad Company, amounting to $30,000, and those issued for the relief of the State treasury, amounting to $65,000; but it establishes no fact touching their validity, except that it is questioned, and therefore the Board of Liquidation is forbidden to fund them until that question has been finally passed upon by this court, as provided by the first section.

The funding act of 1874 authorized the holders of bonds to bring suit against the Board of Liquidation to enforce their asserted right of funding; but neither that act nor the act No. 11 of 1875 provided the means of litigating and determining questions between the holders and those claiming to be owners adversely to them. No such legislation was necessary, since the general laws are amply sufficient for all such purposes. The suits provided for and authorized by these two acts are to be brought against the Board of Liquidation alone, for the single and specified purpose of testing the legality and validity of any questioned bonds or warrants, particularly the bonds mentioned in the second section of the act of 1875. It does not concern the Board to inquire whether or not the holder, who presents a bond for funding, is the real owner. The question which interests the State, the question which the act of 1875 intends to have determined contradictorily with the Board of Liquidation, and in the last resort, is whether the bond which the holder seeks to have funded is a valid obligation of the State, and, as such, entitled to be funded. Any controversy or question as to the actual ownership would be wholly foreign to the issues which the act intends shall be submitted to this court for determination. It may be that the real owner might intervene, and assert his title against the plaintiff, in a suit brought under this act by the holder claiming to be owner; but if any such question could be entertained in such a suit, the adverse title must be set up plainly and distinctly by the person claiming against the appar-

ent owner, the holder; and it can not be proven incidentally in a suit in which the holder and the Board of Liquidation are the only parties.

The act of 1875 provides that suit may be brought by tax-payers, and that they may intervene in any suit brought against the Board of Liquidation, to test the legality of any warrants or issue of bonds; and it authorizes the holder of such securities, the legality, validity, or consideration of which is questioned in such suit, to intervene for the protection of his rights.

It is manifest that the intervention of Newman in this case is not authorized by this act. The bond held by him is not questioned or attacked in the suit; nor is there any thing in common between it and the bonds held by plaintiffs, except that they respectively belong to issues which are questioned, and which the Board of Liquidation is forbidden to fund, except on the final decree of this court. The case of the intervenor was put at issue and passed upon in the district court, without objection; and we see no good reason why it should not be disposed of in this proceeding; but we think confusion might arise if the holders of bonds in no way connected with those which the plaintiff seeks to have funded, issued under a different law, for wholly different purposes, to different payees, are permitted to intervene, and to have their separate and distinct demands passed upon in that suit. We mention this now in order that such unnecessary complications may be avoided.

Plaintiffs and intervenor in their answers to the appeal ask that the judgment appealed from may be so amended as to decree that the costs be paid from the State treasury; and we think they are entitled to this relief under the first section of act No. 11 of 1875.

We find and declare, and we intend that our decree shall not extend beyond this, that the five bonds held by plaintiffs, each for $1000, Nos. 13, 14, 15, 16, 20, issued to the Baton Rouge, Grosse Tête, and Opelousas Railroad Company, indorsed in blank by the President and Secretary of the company, and the bond held by intervenor for $500, No. 605, issued for the relief of the State treasury, indorsed in blank by the payee, the Treasurer, are legal and valid obligations against the State of Louisiana; and that the same were issued in strict conformity to law, and not in violation of the constitution of this State or of the United States, and for a valuable consideration; and that they are entitled as such to be funded.

If there is any adverse title or claim to these bonds, it must be asserted and litigated in a proceeding wholly different from this, and between the proper parties. The apparent legal title is in the plaintiffs and intervenor; but if some other persons are the real owners, our decree does not preclude them.

It is therefore ordered, adjudged, and decreed that the judgment

appealed from be so amended as to decree that the costs of this proceeding, as well in the district court as in this court, be borne by the State of Louisiana, and be paid from the State treasury in accordance with the terms and provisions of section one of act No. 11 of 1875, extra session; and, as thus amended, that said judgment be affirmed, with the reservation of the rights of all persons whomsoever claiming to be the owners of the bonds the subject matter of this suit.